UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| Maximilian Josef Rainer Vonnahme, | Case No.: 2:22-cv-00707-JAD-NJK |
| Petitioner | |
| v. | **Order Directing Return of Minor Child to Country of Habitual Residence** |
| Gleydi Danay Mustelier Lugo, | *\*\*redacted\*\** |
| Respondent | |

Petitioner Maximilian Josef Rainer Vonnahme, a German citizen, sues his ex-wife, Gleydi Danay Mustelier Lugo, a dual citizen of Germany and Cuba, under the 1980 Hague Convention on the Civil Aspects of International Child Abduction, the federal International Child Abduction Remedies Act, and Nevada's Uniform Child Abduction Act for the return of their daughter I.M.V.M. to Germany.[1] I previously granted Vonnahme's motion for a temporary restraining order, enjoined Lugo from taking the child outside the State of Nevada without the court's authorization, and set a hearing on the merits of Vonnahme's petition.[2] At the end of a three-day evidentiary hearing,[3] I ordered the parties to brief three specific legal issues concerning the recognition of custody rights in their Cuban divorce decree, the absence of those rights in the German recognition of that decree, and how German and Cuban law would determine the parties' custody rights given those inconsistencies.[4] With the benefit of this briefing, I have determined that I.M.V.M. must be returned to Germany for further proceedings to determine

---

[1] ECF No. 1.

[2] ECF No. 5.

[3] The three-day evidentiary hearing took place on July 7, 2022; July 20, 2022; and July 29, 2022. ECF No. 27; ECF No. 28; ECF No. 29.

[4] ECF No. 29.

parental custody. I also order the prevailing party to pay the costs of court interpretation services used during the evidentiary hearings.

## Background[5]

Vonnahme and Lugo married in Cuba in 2011. Their daughter I.M.V.M. was born in April 2013, in Havana, Cuba. Lugo and I.M.V.M. moved to Paderborn, Germany in 2013. The couple separated in 2014, and Vonnahme pursued a divorce in Cuba in 2015. That divorce was granted, and the decree established that "*patria potestas*" (parental authority) would remain with both parties, while "*guardia y cuidada*" (custody and care) would remain with Lugo.[6] Later that year, Vonnahme applied to have the divorce recognized in Germany. The Dusseldorf High Regional Court recognized the Cuban decree to the extent that the parties were divorced, but it did not mention custody rights.[7] Lugo and I.M.V.M. lived in Germany from November 2013 through early 2022. Throughout those years, I.M.V.M. primarily lived with Lugo, and Vonnahme had the child stay with him most weekends. Vonnahme also visited on occasional weekdays, took Lugo and the child on regular vacations, and spent holidays with them. On January 28, 2022, Lugo took I.M.V.M. to Las Vegas. The next day, she texted Vonnahme to inform him that she had arrived in Las Vegas and intended to look for work here. Vonnahme filed this action in May 2022.

---

[5] Unless otherwise noted, these facts are taken from testimony at the evidentiary hearings.
[6] Vonnahme's Ex. 4; Vonnahme's Ex. 5.
[7] Vonnahme's Ex. 7.

**Discussion**

## I. Legal standard

The 1980 Hague Convention on the Civil Aspects of International Child Abduction was created to "secure the prompt return of children wrongfully removed to or retained in" any signatory country.[8] "A court that receives a petition under the Hague Convention may not resolve the question of who, as between the parents, is best suited to have custody of the child. With a few narrow exceptions, the court must return the abducted child to its country of habitual residence so that the courts of *that* country can determine custody."[9] This court's focus is more narrow:

> "A court [determining whether a child was wrongfully removed must] answer a series of four questions: (1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention?"[10]

The petitioner must establish the merits of a wrongful-removal petition by a preponderance of the evidence.[11]

## II. I.M.V.M.'s wrongful retention occurred in early 2022.

Lugo arrived in Las Vegas on January 28, 2022. She testified that she did not originally intend to stay in the United States during that trip but visited to learn if she could get a work visa

---

[8] The Hague Convention on the Civil Aspects of International Child Abduction (Hague Convention), Oct. 25, 1980, art. 1, T.I.A.S. No. 11670.

[9] *Cueller v. Joyce*, 596 F.3d 505, 508 (9th Cir. 2010).

[10] *Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001), *abrogated on other grounds by Monasky v. Taglieri*, 140 S. Ct. 719 (2020).

[11] 22 U.S.C. § 9003(e)(1)(A).

and move to Nevada at a later date.  Lugo testified that she couldn't afford her return trip to Germany because she was not receiving child support from the fathers of her two children.  Lugo's cousin testified that Lugo decided she became unwilling to return to Germany in March 2022, once she was given notice of Vonnahme's lawsuit.

But evidence admitted at the hearing raises doubts about the credibility of that testimony.  On January 29, 2022, Lugo texted Vonnahme to inform him that she arrived in Las Vegas and was "finding out about the possibility of living and working here" and that she had "appointments with a lawyer starting next week."[12]  She also texted Fabrice Freidrich, the father of her other child, and told him that she "got an offer where [she has] the opportunity to live and work" in Las Vegas.[13]  And Lugo testified that she sent a letter to her landlord's wife on January 19, 2022, more than a week before departing Germany for Las Vegas, terminating her rental agreement in Germany because she "took on a job abroad."  Given the weight of the evidence, I find that Lugo removed I.M.V.M. on January 28, 2022, as she intended to remain in Las Vegas indefinitely starting at that time.  But even if I credited the testimony establishing that she did not decide to stay indefinitely in the United States until March 2022, my analysis would not change.  Whether Lugo indefinitely removed I.M.V.M. in January 2022 or has retained her indefinitely in the United States since March 2022, she wrongfully did so under the Hague Convention.

---

[12] Vonnahme's Ex. 18.

[13] Vonnahme's Ex. 20.

### III. Germany was the child's state of habitual residence immediately prior to the child's removal.

Determining a child's habitual residence "is a fact-driven inquiry" that must be "sensitive to the unique circumstances of the case and informed by common sense."[14] Here, Lugo and the child lived in Germany from November 2013 through January 2022, when Lugo took I.M.V.M. to Las Vegas. Vonnahme testified that the child attended school, engaged in extracurricular activities, and visited her primary doctor in Germany. Lugo does not dispute these facts. She instead points to her testimony showing that she and her child "moved to Germany without [Vonnahme]'s knowledge or assistance, . . . that [Vonnahme] . . . wanted [Lugo] to remain in Cuba with the child until she turned six," and that Vonnahme "obtained a default decree of divorce in Cuba, which awards [Lugo] the 'care and custody of the child' at her address in Cuba."[15]

Ultimately, Lugo's testimony does not contest that the child lived exclusively in Germany for the last decade. She instead appears to argue that she and Vonnahme didn't share the "intent" that the child would live in Germany and that Vonnahme actually intended that she live in Cuba. But the parties' shared intent or any actual agreement about the child's residence is no longer the controlling factor when determining habitual residence. Indeed, "[t]here are no categorical requirements for establishing a child's habitual residence—least of all an actual-agreement [requirement]."[16] Lugo's focus on shared intent misstates the law and ignores the fact-intensive inquiry that courts must make to determine habitual residence. And based on the

---

[14] *Monasky v. Taglieri*, 140 S. Ct. 719, 727 (2020) (citation omitted).
[15] ECF No. 33 at 11.
[16] *Monasky*, 140 S. Ct. at 728.

exhibits and testimony introduced at the hearing, there is no genuine dispute that the child has lived in Germany with her mother for the past eleven years, took only occasional trips to Cuba, and resided in Germany when Lugo took the child to Las Vegas in January 2022.[17] So I find that Vonnahme has shown by a preponderance of the evidence that Germany is the child's habitual residence.

### IV. The child's removal breached Vonnahme's custody rights under German law.

The Hague Convention defines "rights of custody" to "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence," while "rights of access" include "the right to take a child for a limited period of time to a place other than the child's habitual residence."[18] Lugo contends that the terms of the Cuban divorce decree control and afford Vonnahme only access rights.[19] Vonnahme responds that German law automatically affords joint custody rights to parents after a divorce and, because the German recognition of the Cuban divorce did not specifically recognize the custody portions of the Cuban decree, the German status quo of joint custody applies.[20] He further argues that, even if the Cuban decree controls the parties' custody rights in Germany, the decree awards him rights of parental authority, which are equivalent to custody rights, not merely access rights.[21]

---

[17] *See id.* at 727 ("Common sense suggests that some cases will be straightforward: [when] a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence.").

[18] Hague Convention, art. 5.

[19] ECF No. 33 at 12.

[20] ECF No. 32 at 6–8.

[21] *Id.* at 9–11.

### A. German law does not clearly supersede the custodial arrangements in the Cuban divorce decree.

The German Civil Code states that both parents typically share parental custody (which "includes the care for the person of the child and the property of the child") and acknowledges that "[t]he best interests of the child as a general rule include contact with both parents."[22] If the parents "live apart for a period that is not merely temporary" and have joint parental custody, "each parent may apply for the family court to transfer parental custody or part of parental custody to him alone."[23] Parents who share joint custody but live apart must mutually agree on matters "of substantial significance for the child."[24] So, Vonnahme argues, absent an agreement to the contrary, German law provides joint custody to parents when they divorce. The parties appear to agree on this point.

But Lugo contends that entry of the Cuban decree evinces the parties' agreement to an arrangement that deprives Vonnahme of his custody rights. She argues that, by recognizing the Cuban decree, the German court impliedly recognized the portion of the decree relating to custody rights.[25] Vonnahme disagrees. He argues that the Dusseldorf High Regional Court

---

[22] German Civil Code, § 1626(1), (3), available at https://www.gesetze-im-internet.de/englisch_bgb/englisch_bgb.html.

[23] *Id.* at § 1671(1).

[24] *Id.* at § 1687(1).

[25] In her post-hearing brief, Lugo relies on a letter from Silvia Katzenmaier, a German family law attorney, to argue that this doctrine of "implicit recognition" has been endorsed by German courts and would apply here. ECF No. 33 at 12. Vonnahme correctly points out in his reply brief that this authority is inadmissible and should be disregarded because the time for presenting that evidence was at the hearing, when Vonnahme would have had the opportunity to cross-examine Katzenmaier. ECF No. 36 at 2–3. I agree and do not consider the legal opinions raised in Katzenmaier's letter. But to the extent that Lugo generally argues that the text of Germany's civil code does not support Vonnahme's conclusions, I consider that point as I would any legal argument raised by counsel.

7

recognized the Cuban decree under § 107 of the "Act on Proceedings in Family Matters and in Matters of Non-Contentious Jurisdiction," which limits recognition to "marital matters," defined in § 121 of the Act as proceedings "concerning dissolution of the marriage (divorce matters), concerning annulment of the marriage, and concerning the establishment of the existence or non-existence of a marriage between the participants" and specifies the procedure to have those matters recognized.[26]  Section 108, titled "recognition of other foreign judgments," states that, "with the exclusion of judgments in marital matters . . . foreign judgments shall be recognized without the requirement of a particular proceeding."[27]

Vonnahme focuses on the word *particular*, interpreting § 108 to mean that parties need not follow a specific procedure—like the one delineated in § 107— to seek recognition of non-marital foreign judgments, but that they must still engage in some kind of proceeding to give effect to custody arrangements different from the default joint custody under German Civil Code § 1626.[28]  He also points to the German recognition document's language, which states that all legal requirements to recognize the Cuban decree are met "*insofar as* the marriage between [the parties] has been divorced."[29]  He contends that this language clearly limits the recognition to the

---

[26] Germany's Act on Proceedings in Family Matters and in Matters of Non-Contentious Jurisdiction, §§ 107, 121, available at https://www.gesetze-im-internet.de/englisch_famfg/englisch_famfg.html.

[27] *Id.* at § 108(1).

[28] ECF No. 36 at 3.

[29] Vonnahme's Ex. 7.  Vonnahme also points to a letter accompanying the German recognition document, which notes that "[a]ny further decisions on the consequences of the divorce (e.g., the regulation of parental care or visitation rights for children of the marriage . . .) are not examined in the recognition proceedings.  An ambiguity or even a dispute about these consequential matters does not prevent the divorce from being recognized.  Rather, the courts remain competent to decide on the consequences of divorce."  Lugo's Ex. G.  But this letter does not definitively confirm that German law supersedes any consequential matters mentioned in the divorce decree—it only says that those matters were not examined and that any dispute can be

8

marital union and nothing more.[30]  Lugo instead focuses on § 108's declaration that other foreign judgments "*shall be recognized*" and argues that this language means foreign judgments (except for those involving marital matters) are automatically given full faith and credit, regardless of any perceived limitations in the German recognition document.[31]

Both parties proffer plausible interpretations of this ambiguous language.  For the most part, German law is silent about the process to have foreign custody decisions recognized in Germany.  Section § 108's acknowledgment that other foreign judgments will be recognized without any particular proceeding could plausibly be read to allow implicit recognition of those judgments, but may also be read to require some proceeding—though not a particular one—to give them effect.  So because I find that German law does not unambiguously provide Vonnahme with joint custody as he claims, I move on to consider whether the custody terms of the Cuban decree, if they were implicitly recognized by German courts, would provide him with custody rights under the Hague Convention.

**B.     The Cuban decree confers rights of custody to Vonnahme.**

The parties' Cuban divorce decree states that "[t]he custody and care of the minor daughter of the spouses . . . remain with the mother, with parental authority remaining with both parents" and goes on to explain that the father must pay child support and "may visit the daughter as he pleases, without disturbing the times of sleep and meals; he can go for a walk

---

resolved in court.  I do not read the letter to mean that the German court explicitly declined to acknowledge the parental rights memorialized in the Cuban decree.

[30] ECF No. 32 at 6.

[31] ECF No. 33 at 12.

with her."[32] The original Spanish-language version of the decree makes Lugo responsible for the "*guardia y cuidado*" of the child, while "*patria potestas*" remains with both parents.

American courts have explained that *patria potestas*, a term of art in many Spanish-speaking countries, "has consistently and rightly been recognized as a right of custody under the Hague Convention."[33] Cuba's recognition of *patria potestas* similarly qualifies. Cuban law defines "*patria potestas*" to include extensive rights and duties, including the duties to provide children with a stable home, arrange for their education, care for their property, and represent them in judicial actions.[34] It also refers to "*guardia y cuidado*" rights when parents no longer live together and uses the term to define which parent the child will more permanently live with.[35] But awarding one parent the rights to guardianship and care of a child does not terminate

---

[32] Vonnahme's Ex. 5. At the hearings, the parties provided competing translations of the Cuban divorce decree. *See also* Lugo's Ex. E (translation stating that "the youngest daughter of the marriage . . . remains under the guardianship and care of the mother, with both parents retaining parental authority"). But Vonnahme's was the only version admitted into evidence, so that is the one I cite here.

[33] *Rodriguez v. Sieler*, 2012 WL 5430369, at *5 (D. Mont. Nov. 7, 2012) (interpreting Mexico's *patria potestas* law); *see also, e.g.*, *Whallon v. Lynn*, 230 F.3d 450, 458 (1st Cir. 2000) (interpreting Mexico's recognition of *patria potestas* rights as equivalent to custody rights under the Hague Convention, explaining that term means something more than "mere visitation rights"); *Vale v. Avila*, 538 F.3d 581, 587 (7th Cir. 2008) (analyzing Venezuelan law and finding that the "rights and duties of *patria potestas* are so extensive that a parent given them is thereby denoted a fit custodial parent . . . , even if, when both parents are holders, one is likely to have physical custody . . . ."); *Diaz v. Rios Ibarra*, 2019 WL 4394491, at *6 (D. Ariz. Sept. 13, 2019) (recognizing that, under Mexican law, "*patria potestas* constitutes the most comprehensive right that a parent can exercise over the person and property of his or her minor children") (cleaned up); *Gonzales v. Preston*, 107 F. Supp. 3d 1226, 1234 (M.D. Ala. 2015) (same); *Garcia v. Varona*, 806 F. Supp. 2d 1299, 2311–12 (N.D. Ga. 2011) (finding that *patria potestas* amounts to custody rights under Spain's Civil Code); *Moreno v. Martin*, 2008 WL 4716958, at *8 (S.D. Fla. Oct. 23, 2008) (same); *Mendez Lynch v. Mendez Lynch*, 220 F. Supp. 2d 1347, 1358 (M.D. Fla. 2002) (noting that parties agreed *patria potestas* equates to custody rights under Argentinian law); *Giampaolo v. Erneta*, 390 F. Supp. 2d 1269, 1277–78 (N.D. Ga. 2004) (same).

[34] Cuban Family Code, art. 85, available at ECF No. 33 at 17.

[35] *See id.* at art. 88–91 (defining "guardianship and care" when parents do not live together).

the other parent's *patria potestas* rights.[36] The Cuban Family Code also states that, in the event of divorce, the "court will grant *patria potestas*, establishing as a rule that both parents shall retain it over their minors."[37]

Lugo largely overlooks the legal meaning of *patria potestas* and instead focuses on the specific visitation language in the Cuban decree.[38] She cites to the Ninth Circuit's opinion in *Gonzalez v. Gutierrez*[39] to argue that the decree's specific terms represent the full extent of Vonnahme's parental rights.[40] But in *Gonzalez*, the parties "executed a formal, legal custody agreement" that did not include *patria potestas* rights and instead enumerated the petitioning parent's visitation and access rights.[41] Lugo and Vonnahme's Cuban decree, in contrast, recognized joint *patria potestas* rights while also specifying some visitation rights. So this decree does not "eliminate any basis for relying on *patria potestas*," unlike in *Gonzalez*, because the decree itself recognizes Vonnahme's *patria potestas* rights.[42]

The facts of this case are more akin to the Seventh Circuit's decision in *Vale v. Avila*, in which the parents' Venezuelan divorce decree gave both parents *patria potestas* rights, gave one parent physical custody, and set out visitation rights for the other parent.[43] In that case, the Seventh Circuit held that the divorce decree gave custody rights to both parents when it

---

[36] *See id.* at art. 92–98 (describing the circumstances under which *patria potestas* can be terminated or suspended, none of which have been shown to apply here).

[37] Cuban Family Code, art. 57.

[38] ECF No. 33 at 13–14.

[39] *Gonzalez v. Gutierrez*, 311 F.3d 942 (9th Cir. 2002), *abrogated on other grounds by Abbott v. Abbott*, 560 U.S. 1 (2010)).

[40] ECF No. 33 at 14.

[41] *Gonzalez*, 311 F.3d at 954.

[42] *See id.*

[43] *Vale v. Avila*, 538 F.3d 581, 584 (7th Cir. 2008).

11

acknowledged their joint *patria potestas* rights, regardless of the specific visitation arrangements that were also memorialized in the decree.[44] So, I find that, either under operation of Germany's automatic assumption of joint custody or Germany's implicit recognition of the Cuban divorce decree, Vonnahme has custody rights under the Hague Convention.

**V.     Vonnahme was exercising his custody rights at the time of removal.**

"[F]ederal circuit courts in the United States have consistently required a showing that a parent has clearly and unequivocally abandoned a child before ruling that that parent is not actually exercising his custody rights."[45] "Once it determines that the parent exercised a custody right in any manner, the [c]ourt should stop—completely avoiding the question whether the parent exercised the custody rights well or badly."[46] Lugo essentially argues that, because Vonnahme did not have *physical* custody of I.M.V.M., he was not exercising his custodial rights when she was removed.[47] She contends that he merely visited his daughter, took her on vacations, and saw her at holidays—often with Lugo present. But Vonnahme need not show more than that to demonstrate that he has been exercising his custody rights.[48] The record establishes that Vonnahme saw the child most weekends, took her to extracurricular activities during the school week, vacationed with her, and saw her on holidays. I find that Vonnahme has met his "minimal" burden to show that he was exercising his custody rights at the time the child was removed.[49]

---

[44] *Id.* at 587.

[45] *In re ICJ*, 13 F.4th 753, 762 (9th Cir. 2021).

[46] *Asvesta v. Petroutsas*, 580 F.3d 1000, 1018 (9th Cir. 2009) (quotation omitted).

[47] ECF No. 33 at 15–16.

[48] *See ICJ*, 13 F.4th at 762 (finding that parent who saw his child often and kept the child overnight on several occasions was exercising his custodial rights).

[49] *See id.* at 763.

**VI.  Lugo has not proven that she can benefit from any of the Hague Convention's narrow defenses.**

"The Convention recognizes several 'narrow' defenses to, or exceptions from, returning the child to her country of habitual residency" after a finding that the child was wrongfully removed or retained.[50] Lugo relies on two of these: that Vonnahme "had consented to or subsequently acquiesced in the removal or retention" and that "there is a grave risk that [the child's] return would expose [her] to physical or psychological harm or otherwise place the child in an intolerable situation."[51]

**A.  Vonnahme didn't consent to or acquiesce in the child's removal.**

The respondent has the burden of proving by a preponderance of the evidence that the petitioner "had consented to or subsequently acquiesced in the removal or retention."[52] "Being victim of a successful abduction can never prove consent. Even ambiguous statements or actions don't suffice; the Convention requires the parent opposing removal to 'unequivocally demonstrate that the petitioning parent consented to the child's indefinite stay in America.'"[53] Courts have further required that the defense of acquiescence requires "an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time."[54] The consent and acquiescence inquiries "focus on the petitioner's subjective intent."[55]

---

[50] *Id.* at 760 (citing 22 U.S.C. § 9001(a)(4)).

[51] Hague Convention art. 13.

[52] *Id.* at art. 13(a); 22 U.S.C. 9003(e)(2)(B).

[53] *Cuellar v. Joyce*, 596 F.3d 505, 512 (9th Cir. 2010) (quoting *Asvesta*, 580 F.3d at 1019).

[54] *Baxter v. Baxter*, 423 F.3d 363, 372 (3d Cir. 2005) (citing *Freidrich v. Freidrich*, 78 F.3d 1060, 1070 (6th Cir. 1996)).

[55] *Id.* at 371–72.

13

Lugo fails to show that Vonnahme consented to the child's retention in Las Vegas. She cites to her testimony showing that Lugo and Max discussed her trip and that Vonnahme offered to drive her to the airport.[56] But the testimony establishes that Vonnahme was told only that Lugo's trip would be temporary, and Vonnahme insists that Lugo told him she was traveling to Cuba, not Las Vegas.[57] Consent to a brief trip does not equate to consent to the child's indefinite relocation to the United States.[58]

Lugo also contends that Vonnahme acquiesced to the child remaining in Las Vegas by "failing to provide child support . . . from March onward, despite knowing that [Lugo] could not afford to return to Germany without support."[59] Vonnahme's testimony established that he stopped paying support because he was concerned that Lugo's German bank account would be seized and that he attempted to arrange alternative payment methods, but Lugo did not respond with the necessary instructions to do so. Despite any factual disputes that the parties have about why Vonnahme stopped paying child support, I find that Lugo has not shown that Vonnahme's

---

[56] ECF No. 33 at 17.

[57] The parties present different versions of the events leading to Lugo's Las Vegas trip. Both testified that Lugo sent a letter to I.M.V.M.'s school requesting a ten-day leave of absence purportedly to travel to Cuba in order to preserve I.M.V.M.'s citizenship and property rights there. Vonnahme testified that he believed that was the trip Lugo and I.M.V.M. were taking and that Lugo did not inform him that they were instead traveling to Las Vegas. Lugo testified that she told Vonnahme that she was taking a temporary trip to Las Vegas a couple of days before she left Germany. Ultimately these disputes do not factor into my analysis because, either way, the parties agree that Lugo did not tell Vonnahme that she would be going to the United States indefinitely—any discussions the parties had before she arrived in Las Vegas centered around her taking a ten-day trip and nothing more.

[58] *See Gonzalez-Caballero v. Mena*, 251 F.3d 789, 793–94 (9th Cir. 2001) (finding that a parent's authorization of temporary removal did not equate to consent to the child's permanent or indefinite removal under the Hague Convention).

[59] ECF No. 33 at 17.

failure to pay amounts to his acquiescence.[60]  Vonnahme has consistently indicated that he has not agreed to have the child remain in the United States.  Lugo has failed to show evidence of any written communication indicating that Vonnahme accepted her relocation, nor any evidence of Vonnahme's subjective intent to have the child remain here.  So Lugo has not met her burden to show Vonnahme's consent or acquiescence.

### B. Lugo has not presented evidence that the child would be at grave risk of harm if she is returned to Germany.

Lugo must show by clear and convincing evidence that "there is a grave risk that [the child's] return would expose [her] to physical or psychological harm or otherwise place the child in an intolerable situation."[61]  "United States courts have consistently recognized that [the Hague Convention's] exception for grave risk should be narrowly drawn."[62]  Lugo first contends that because I.M.V.M "has never lived without her mother for more than a few days," returning her to Germany would place the child in an intolerable situation.[63]  But Lugo has not shown that any discomfort felt by I.M.V.M would be "any greater than would normally be expected on taking a child away from one parent and passing [her] to another."[64]  So Lugo's evidence is insufficient to prove grave risk of harm.

Lugo next contends that she "presented credible evidence that [Vonnahme] has a temper and has committed acts of domestic violence against her"—in particular, Lugo testified that

---

[60] *Cf. In re ICJ*, 13 F.4th at 763 (finding that a parent doesn't abandon custody rights when "that parent stops financial support for short periods of time").

[61] Hague Convention, art. 13; 22 U.S.C. § 9003(e)(2).

[62] *Asvesta v. Petroutsas*, 580 F.3d 1000, 1020 (9th Cir. 2009).

[63] ECF No. 33 at 18.

[64] *Asvesta*, 580 F.3d at 1020.

while on vacation together in Italy, Vonnahme "pushed [Lugo,] causing her face to hit a wall, which cracked her tooth and ultimately forced her to replace [it]."[65] Lugo argues that forcing the child to live with "her mother's abuser" would place the child in an intolerable situation.[66] Vonnahme testified that Lugo's injury was caused by a car accident. Lugo testified that they got into the accident the day after Vonnahme pushed her and caused her injury. She also testified that she went to a hospital after the accident to seek treatment for her lip and told the hospital that "it had been an accident." Neither party presented corroborating evidence supporting their versions of events, and Lugo did not present any further evidence to corroborate that Vonnahme abused her. And the record is devoid of testimony or other evidence that Vonnahme ever directed his allegedly short temper or violent tendencies toward his daughter in any way. To the contrary, numerous witnesses testified that Vonnahme and his daughter have an affectionate, loving relationship. In short, Lugo has not shown by clear and convincing evidence that Vonnahme committed acts of violence against her or that he would harm his daughter if she were returned to Germany. So I find that the child was wrongfully removed and retained in the United States and that Lugo has not proven any defenses that should prevent I.M.V.M.'s return.

### VI.   The prevailing party must pay the costs of interpreter services.

In a previous minute order, I stated that the court would bear the costs for interpretation services utilized at the hearing.[67] I have since been advised that the court is not authorized to pay the costs of these servicers in non-criminal matters. So I order that petitioner Maximillian

---

[65] ECF No. 33 at 18. Throughout her testimony, Lugo represented that this incident happened in Italy. But in her response brief, she states that it occurred in Paris.

[66] *Id.*

[67] *See* ECF No. 20.

16

Vonnahme must pay the costs of interpretation services from the evidentiary hearing by September 5, 2022.

### Conclusion

IT IS THEREFORE ORDERED that, by September 5, 2022, Maximillian Vonnahme must **pay the costs of translation services** incurred during the evidentiary hearings. Payments to the following interpreters in the following amounts must be made directly to these interpreters and sent to the addresses on the attached invoices:

    Anna Koch: $836

    Apex Translation: $836

    Castro Interpreting: $800

    Ladan Dillon: $202

Vonnahme must also **file a notice with this court** by September 6, 2022, affirming that these payments were timely made.

IT IS FURTHER ORDERED that:

Under the provisions of The Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980, and/or the International Child Abduction Remedies Act, 42 U.S.C. § 11601 et seq, **I.M.V.M. (born April 10, 2013) must be returned in the company of her father, Maximillian Vonnahme, to the nation of Germany.** The child's mother, Gleydi Lugo, may accompany them to Germany but is not required to. Unless the parties come to some other agreement, the child must be returned to Germany **within 14 calendar days of this order**. The father must report the return of the child to the appropriate Central Authority under the Hague Convention in Germany within 10 calendar days of their arrival.

The parties are strongly encouraged to work out a visitation schedule with the child in the short term (i.e., before her return to Germany), and for the time thereafter until the German authorities can issue a custody order.  The parties also are strongly encouraged to reasonably arrange the date and time of departure from the United States.  In the absence of any written agreement between Vonnahme and Lugo, by virtue of this order, Maximillian Vonnahme has the exclusive right to the physical and legal custody of the child during the period of time required to return the child to Germany, the country of the child's habitual residence.

This order is not a determination of the merits of any custody issues within the meaning of Article 19 of the Convention.  Indeed, the appropriate authorities in Germany may determine that it is best for the minor to be returned to the custody of Lugo in Germany or the United States.

The order of this court is made under the authority of 42 U.S.C. § 11603(a), conferring upon this court concurrent original jurisdiction with the state courts of the United States.

NOW THEREFORE, TO ANY PEACE OFFICER IN THE STATE OF NEVADA, AND TO ANY FEDERAL OFFICER:

YOU ARE HEREBY COMMANDED to enforce the instant order allowing MAXIMILLIAN VONNAHME to remove the above-named child from the United States of America to the country of Germany, giving said MAXIMILLIAN VONNAHME the right, without interference, to have said child in his lawful custody for the purposes described herein.

This order is effective as of the date written below and will continue in force and effect until modified or cancelled by this court or a court of competent jurisdiction in Germany.

_____
U.S. District Judge Jennifer A. Dorsey
August 26, 2022